UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DANIEL MELE, d/b/a Blizzard Records, and                    02-CV-0450E(F)
BLIZZARD RECORDS, INC.,

                Plaintiffs,                    FINDINGS OF FACT,
                                                        CONCLUSIONS OF LAW
    -vs-                                                        and
                                                                ORDER
DAVIDSON & ASSOCIATES, INC.,

                Defendant.

---

Plaintiffs Daniel Mele d/b/a/ Blizzard Records and Blizzard Records, Inc.

(collectively "Blizzard Records") commenced this declaratory judgment action on

June 21, 2002 seeking, *inter alia*, a declaration that plaintiffs' use of the BLIZZARD

RECORDS trademark does not infringe on defendant Davidson & Associates,

Inc.'s trademarks and that defendant's use of the marks BLIZZARD and

BLIZZARD ENTERTAINMENT in any aspect of the music industry violates

plaintiffs' trademarks and to enjoin defendant's use of the BLIZZARD and

BLIZZARD ENTERTAINMENT marks in the music industry.

Defendant filed two motions for partial summary judgment.  In the first such

motion, defendant sought a declaratory judgment that it has an incontestable

right to use its BLIZZARD ENTERTAINMENT trademark in connection with

computer programs for video and computer games pursuant to 15 U.S.C. §1065.

Said motion was denied by the Court's October 7, 2004 Memorandum and Order

("Order"), which held that defendant's trademark rights in connection with its computer programs were not raised in the pleadings and thus not relevant to the action. (Order at 14-16.) In defendant's second motion for summary judgment, defendant claimed that (1) it had acquired rights in the BLIZZARD ENTERTAINMENT trademark before plaintiffs acquired any trademark rights in BLIZZARD RECORDS, (2) plaintiffs did not own any enforceable rights in the BLIZZARD RECORDS designation before August 1999, (3) if plaintiffs did acquire trademarks rights to BLIZZARD RECORDS, they abandoned those rights between 1987 and 1995 and (4) plaintiffs' damages and attorneys' fees claims should be dismissed. After a thorough review of the evidence, the undersigned found that plaintiffs had abandoned their trademark rights between 1987 and 1995 for lack of commercial use and that, although defendant had acquired its trademark rights in 1994 for its computer programs, those rights do not extend to trademark rights for music-only compact discs ("CDs") and downloads. The Order also dismissed plaintiffs' damages and attorneys' fees claims finding that defendant lacked any bad faith. Subsequently, a three-day bench trial was held from February 28 to March 2, 2005, after which the parties submitted post-trial briefs.

Left to be litigated before the Court during the bench trial was the issue of who, as between plaintiffs and defendant, first acquired trademark rights in BLIZZARD for use in the music industry. Pursuant to Rule 52(a) of the Federal

Rules of Civil Procedure, the Court, having assessed the credibility of the witnesses and reviewed the record and other evidence as well as the parties' post-trial submissions, finds and concludes as follows.

**Findings of Fact.**

<u>Plaintiffs' Use of the BLIZZARD RECORDS Mark.</u>

Plaintiff Daniel Mele adopted the BLIZZARD RECORDS trademark in July 1986 for use in connection with the promotion of recording artists and the sale and distribution of pre-recorded music by filing an assumed name certificate for "Blizzard Records Company" in Buffalo, N.Y. on July 14, 1986.[1]  On July 13, 2000, plaintiffs filed an application for the BLIZZARD RECORDS trademark with the United States Patent and Trademark Office ("USPTO") for "computerized on-line retail store services featuring prerecorded compact discs and audio tapes featuring music; and promotion of recording artists via a global computer information network."  The registration is still pending due to this action and opposition pending at the Trademark Trial and Appeal Board.

In 1986, plaintiffs began promoting a heavy-metal rock band known as "Zillion".  Zillion's first album was released in 1986 and its last performance was in 1987.  From 1987 to 1993, plaintiffs helped provide Zillion with resources to rehearse and write songs, but did not engage in any activities that exposed the

---

[1]Plaintiff did not register with the United States Patent and Trademark Office.

public to their trademark. In 1993, plaintiffs began representing the band "Chillin'
Sun".  Plaintiffs did not present any new evidence at trial — to wit, evidence was
not before the Court when issuing the Order — regarding their activities prior to
1995.  As such, the Court's holdings in the Order that plaintiffs in 1987 abandoned
any trademark rights in BLIZZARD RECORDS they may have acquired and did not
reacquire those rights earlier than 1995 stand.  With regards to plaintiffs' post-
1995 activities, the Court findings are set forth below.

Beginning in 1995, plaintiffs retained attorney Owen Sloane to represent
plaintiffs in dealings with record companies.  (Mele, T1[2] at 37.)   At the time,
plaintiffs were representing only Chillin' Sun on the BLIZZARD RECORDS label.
On August 8 and 9, 1995, plaintiffs arranged for Chillin' Sun to perform at two
showcases held at Burbank Studios, during which plaintiffs distributed flyers
bearing the BLIZZARD RECORDS mark but said mark was not on the CD
distributed at the showcases.  (*Id.* at 38-39, 112-113.)  On or around July 11, 1997,
1,098 Chillin' Sun CDs were produced, which CDs bore the BLIZZARD RECORDS
trademark.  (*Id.* at 43, 46.)  In the promotion of the Chillin' Sun CDs, however,
BLIZZARD RECORDS was not mentioned.  (*Id.* at 111.)  Furthermore, between
1995 and August 1999, BLIZZARD RECORDS was not mentioned on any form of

---

[2]References to the trial transcript will be made by stating the surname of the witness,
followed by the volume of the transcript, followed by the page numbers from the transcript.
Volume one of the trial transcript will be denoted as "T1", volume two as "T2", and volume three
as "T3".

advertising, promotional materials or other media available to the public. (*Id.* at 104-117.)  Plaintiffs did give a copy of the Chillin' Sun CD to one Buffalo radio station who never played the CD on air. (*Id.* at 105.)  All other distribution attempts of the CD were made to friends, family and the like. (*Id.* at 104-120.)

Starting in August 1999 and continuing to date, plaintiffs promote and sell music and musical recordings through the internet using the domain name "blizzardrecords.com".  Of the nearly 700 CDs on the Blizzard Records website, only two bear the BLIZZARD RECORDS mark. (*Id.* at 125.)

Defendant's Use of the BLIZZARD ENTERTAINMENT Mark.

Defendant, a video and computer game development company, first adopted the BLIZZARD trademark in May 17, 1994 upon filing an intent-to-use application for the BLIZZARD ENTERTAINMENT mark with the USPTO. (Rigole, T2 at 98-99.)  Defendant first used the mark in commerce at least as early as November 15, 1994 with the release of the computer game "WarCraft: Orcs and Humans" and has continuously and without interruption used the BLIZZARD ENTERTAINMENT mark in connection with the goods identified in its registration. (Morhaime, T3 at 17.)  The BLIZZARD ENTERTAINMENT mark is visible on all of defendant's products and on its website and is a strong, recognizable and respected mark in the video game industry. (*See, e.g.,* Schiller, T2 at 33, 63; Morhaime, T3 at 68.)

- 5 -

Prior to acquiring the BLIZZARD trademark, defendant had been called Chaos Studios, but then discovered that another company was doing business as Chaos Technologies.  Defendant had to find a new corporate name and, after a series of brainstorming sessions, the company settled on Blizzard Entertainment and asked their attorneys to conduct trademark searches.  These searches did not identify any conflicting uses and the company began using Blizzard Entertainment as its trade name.  (Morhaime, T3 at 48-50.)

Beginning in 1994 and continuing through today, Blizzard Entertainment produces, distributes and markets a series of financially successful games under the BLIZZARD ENTERTAINMENT mark.  (*Id.* at 4-10.)  In 1996, Blizzard Entertainment launched a website using the domain name "blizzard.com" to promote its products and services online.  WarCraft, StarCraft and Diablo are defendant's three main franchises or game series.  WarCraft and StarCraft are "real time strategy games", which means that the player must make decisions quickly and need not wait for the opposing player to make a move before he makes his moves.  Diablo is a "role playing game" where the players fight the forces of evil under the guise of a fantasy hero.  (*Id.* at 10-12.)  There are seven games in the WarCraft series, two in the StarCraft series and three in the Diablo series.  (Def.'s Ex. 71.)

Defendant's games have always included original music created by defendant, which music defendant has registered for copyright protection.

(Rigole, T2 at 102-103; Morhaime, T3 at 25.)  The music in the games helps to set their mood and stage and to direct players throughout the games.  (Morhaime, T3 at 25-26.)  Defendant's second game, "WarCraft II: Tides of Darkness", was released on December 3, 1995 and contained music in multiple formats, one of which was a "Red Book Audio" — a format very similar to that of a normal CD. (*Id.* at 30.)  A purchaser of the WarCraft II: Tides of Darkness game could play the game's music separately from the playing of the game.  (*Ibid.*)  The ability to play the music separately was not the primary purpose of encoding the music in Red Book Audio, but ended up as a very positive side benefit.  (Morhaime, T3 at 58-60.)

A subsequent WarCraft game — "WarCraft II: Beyond the Dark" — was released May 8, 1996 and also included music from the game that could be played on a CD-player and thus separately from the game.  (*Id.* at 30.)  Moreover, defendant, in mid-to-late-1998, started to release MP3 downloads of the music of its games.  (*Id.* at 31-41.)  Methods of listening to the music from defendant's games without playing the game were made available to defendant's customers both in response to the customers' interest in listening to the music separately and to promote new games.  (*Ibid.*)  As such, in 2002 defendant released a StarCraft music CD that was *sold* separately from the game.  (Morhaime, T3 at 59-62.)  Nonetheless, the StarCraft music CD was still a novelty item, ancillary to the core product — *viz.*, the StarCraft series.  (*Id.* at 63.)  Finally, it was not until April

21, 2000, in preparation for the release of "Diablo II", that defendant offered an

MP3 download that was longer that 41 seconds.  (*Id.* at 65-66.)

On February 26, 2002, after learning about plaintiffs, defendant filed an

intent-to-use application for the BLIZZARD ENTERTAINMENT mark with the

USPTO for, *inter alia*, music.[3]  The application is pending the resolution of this

action.

<u>Video Games and Video Game Consumers.</u>

Video games — those of defendant's and those of other companies — have

always included music.  The complexity and popularity of the music has changed

as has the technology driving the video game market.  (Schiller, T2 at 25-31, 55-

57.)  Video game companies have distributed and will continue to distribute the

music from their games as it is a component of their products that their

consumers enjoy and that further markets their products. (*Id*. at 25-31,55-63.) The

market and the natural course of events has driven and will continue to drive

video game companies to distribute the music separately from their video games.

(*Ibid.*)

Video game consumers, often referred to as "gamers", are brand savvy —

to wit, they are aware of the brands that produce their favorite games and

---

[3]Defendant's application was for the BLIZZARD ENTERTAINMENT mark to be used in connection with "[e]lectronic commerce services, namely, providing online retail, mail order services, featuring computer games, *music*, clothing, books, movies, DVDs, mouse pads, toys, games, videotapes, audiocassettes, compact discs, floppy discs and CD-ROMS[.]" (emphasis added).

purchase games based on the producer of the game.  (Schiller, T2 at 31-51.)  There is a certain "lifestyle" that is associated with gamers and those who really enjoy a particular game comprise the vast majority of those who purchase or download the music from the games.  (*Ibid*; Morhaime, T3 at 31.)

**Parties' Arguments.**

Plaintiffs, in seeking an injunction estopping defendant from using the BLIZZARD or BLIZZARD ENTERTAINMENT mark in the distribution of music and a declaration allowing plaintiffs to continue using the BLIZZARD and BLIZZARD RECORDS marks in the distribution of music, claim that (1) plaintiffs acquired rights to use the marks in the music industry prior to defendant acquiring rights in the same and (2) defendant's use of the marks will likely cause reverse confusion.  Defendant, in response, provided evidence to support its claims that (1) defendant acquired rights in the marks for use to distribute music prior to plaintiffs' acquisition of said rights and (2) there is no likelihood of confusion and thus no infringement.

**Conclusions of Law.**

A claim of trademark infringement brought under 15 U.S.C. §1114(1) for infringement of a registered mark or 15 U.S.C. §1125(a) for infringement of a mark acquired by use is analyzed under a two-prong test: (1) whether plaintiffs' mark is entitled to protection, and (2) whether defendant's use of the mark is likely to cause consumer confusion as to the origin or sponsorship of defendant's goods.

*Virgin Enters. Ltd*. v. *Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (citations omitted).

To prove entitlement to protection, plaintiffs must show prior use and ownership.

*Id.*   To show prior use, plaintiffs must demonstrate that (1) they acquired

trademark rights prior to the date of defendant's acquisition, (2) plaintiffs' use of

the BLIZZARD RECORDS designation has continued since a date prior to

defendant's acquisition and (3) that plaintiffs' prior use is on products with

respect to which infringement has been shown.   *Cullman Ventures, Inc.* v.

*Columbian Art Works, Inc.*, 717 F. Supp. 96, 113 (S.D.N.Y. 1989).

The Court already held, and no evidence was presented at trial to alter the

holding, that plaintiffs had abandoned any rights they may have had to the

BLIZZARD mark for lack of use from 1987 to 1995.   The Court did not, however,

find that plaintiffs resumed use in 1995, but only that "the earliest time" plaintiffs

could have reacquired rights was in August 1995.   (Order at 26.)   Plaintiffs did not

present any evidence during trial that indicated that they made use of the

BLIZZARD mark prior to the launching of their website in August 1999.

The Lanham Act defines the term "use in commerce" as "the bona fide use

of a mark in the ordinary course of trade, and not made merely to reserve a right

in a mark."   15 U.S.C. § 1127.   Furthermore, the Lanham Act deems a mark on

goods to be used in commerce when:

> (A) it is placed in any manner on the goods or their containers or the
> displays associated therewith or on the tags or labels affixed thereto,

> or if the nature of the goods makes such placement impracticable,
> then on documents associated with the goods or their sale, and
> (B) the goods are sold or transported in commerce

*Ibid.* Use does not include the promotional use of the mark on goods in a different course of trade nor mere token use. *Emergency One* v. *Am. Fireeagle, Ltd.*, 228 F.3d 531, 536 (4th Cir. 2000). *See also, Silverman* v. *CBS, Inc.,* 870 F.2d 40, 47-48 (2d Cir.), *cert. denied*, 492 U.S. 907 (1984) (holding sporadic licensing of mark for non-commercial purposes was not a use under the Lanham Act). Furthermore, advertising alone is not sufficient to constitute use unless it reaches a substantial portion of the public. *Lucent Info. Mgmt., Inc.* v. *Lucent Tech.., Inc.*, 986 F. Supp. 253, 259 (D. Del. 1997), *aff'd*, 186 F.3d 311 (3d Cir. 1999).

Here, plaintiffs alleged that (1) retaining an attorney in 1995, (2) arranging two showcases for Chillin' Sun also in 1995, (3) distributing flyers with the BLIZZARD RECORDS mark at the showcases[4] and (4) producing 1,098 copies of one CD for Chillin' Sun and not mentioning BLIZZARD RECORDS in the promotion of said CD, amounts to use. Plaintiffs do not suggest that a "substantial portion of the public" or even *any* portion of the public saw the BLIZZARD RECORDS mark. Plaintiffs did not introduce any promotional materials on which the BLIZZARD RECORDS mark had been placed. The Court therefore concludes that the public was unaware of Blizzard Records and that plaintiffs made insufficient effort to publicize their mark to warrant trademark protections. Only with the

---

[4]The CD's distributed at these showcases did not bear the BLIZZARD RECORDS mark.

launching of their website did plaintiffs engage in any "use" of the BLIZZARD RECORDS mark and therefore the earliest date upon which plaintiffs acquired trademark rights to the BLIZZARD RECORDS mark is August 1999.

The Court further concludes that the defendant was using the BLIZZARD and BLIZZARD ENTERTAINMENT marks in its video games and in the distribution of the music in those video games prior to August 1999. Starting in December 1995, defendant's customers could listen to the music from the WarCraft II: Tides of Darkness game in CD-like format without playing the game and by late 1998 they could play separately the music from the StarCraft games by way of MP3 downloads. In fact, it is the availability of these downloads and opportunities to listen to the music separately from the games that plaintiffs claim is infringing on their alleged rights. The BLIZZARD and/or BLIZZARD ENTERTAINMENT marks are placed on defendant's WarCraft II CDs released in December 1995 and May 1996 and on defendant's website from which the songs can be downloaded in MP3 format. (*See* Morhaime, T3 at 30-31.) Although the success of defendant's distribution of the music from its games was at first surprising to defendant, the subsequent distributions were intentional and in direct response to consumer demands. (*Id.* at 60.) Defendant's actions, thus, amount to use of the BLIZZARD and BLIZZARD ENTERTAINMENT marks in commerce and such use occurred well before any use of the BLIZZARD mark by plaintiffs. Plaintiffs, therefore, have not met their burden in proving that

defendant's use of the BLIZZARD mark violates plaintiffs' trademark rights — *viz.*, plaintiffs' fourth cause of action — and no injunction will issue.

The Court will now address plaintiffs' first three causes of action — *viz.*, that plaintiffs' use of the BLIZZARD mark does not violate defendant's trademark rights. Although defendant acquired trademark rights prior to the date of plaintiffs' use of the mark, defendant does not assert a counterclaim that plaintiffs are infringing on defendant's rights and defendant introduced evidence proving that there is no likelihood of confusion, cutting against any claim that plaintiffs are infringing on defendant's mark. Therefore, based on plaintiffs' and defendant's current use of the BLIZZARD marks, there is no likelihood of confusion and thus no infringement.

Accordingly, for the reasons set forth above, it is hereby FOUND and CONCLUDED that defendant Davidson & Associates, Inc. is not infringing on the trademark rights of plaintiffs Daniel Mele, Blizzard Records and Blizzard Records, Inc., that plaintiffs Daniel Mele, Blizzard Records and Blizzard Records, Inc. are not infringing on the trademark rights of defendant Davidson & Associates, Inc. and that the case shall be closed.

DATED:      Buffalo, N.Y.

            June 13, 2006

                                        _____/s/ John T. Elfvin_____
                                               JOHN T. ELFVIN
                                                  S.U.S.D.J.